158 N.J. Super. 455 (1978)
386 A.2d 448
WESTFIELD CENTRE SERVICE, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND JAMES GALLIGAN, INDIVIDUALLY AND AS PRESIDENT OF WESTFIELD CENTRE SERVICE, INC., PLAINTIFFS,
v.
CITIES SERVICE OIL COMPANY, A DELAWARE CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided March 6, 1978.
*459 Mr. Vincent K. Loughlin for plaintiffs (Messrs. Johnstone & O'Dwyer, attorneys).
Mr. Andrew S. Polito for defendant (Messrs. Mattson, Madden & Polito, attorneys).
ACKERMAN, J.S.C.
This case requires the court, among other things, to construe the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 et seq., and to rule on the act's constitutionality. After a plenary hearing I find the facts as follows:
Plaintiff James L. Galligan purchased the Cities Service franchise at 131-145 Elm Street, Westfield, New Jersey, in April 1973. The franchise was a so-called "traditional gasoline *460 station," providing gasoline and repairs as well as tires, batteries and accessories ("TBAs"). Galligan purchased the franchise for $35,000 from one Raymond Ditzel through plaintiff corporation Westfield Centre Service, Inc. (Westfield), of which Galligan was the sole officer, director and shareholder. Galligan had previously worked part-time at the station for 20 years. The $35,000 purchase price included $8,000 for goodwill
The property on which the franchise was located was owned by defendant Cities Service. Plaintiff was therefore both a franchisee and a lessee.
Galligan originally sought a two-year lease from defendant's then territory supervisor, one Raymond Katalenas. Katalenas told Galligan that only one-year leases could be granted, and further informed him that Cities Service would not permit any changes in the lease whatsoever. Galligan and Katalenas both testified, however, that Katalenas assured Galligan that as long as he did a good job and sold the product for the company, he would never have any trouble. Katalenas further testified that Galligan was expected to sell between 22,000 and 32,000 gallons of gasoline a month. The lease was signed on April 17, 1973 for a one-year term from May 1, 1973 to April 30, 1974. The lease was automatically renewed in April 1974, at which time Galligan formally assigned all his rights under the lease agreement to Westfield, with Galligan remaining personally liable for the corporation's debts to defendant.
I further find that Katalenas informed Galligan sometime in 1974 that defendant intended to sell the station and therefore would not renew the lease in 1975. Galligan told Katalenas about the $35,000 that he had paid for the business, and Katalenas relayed this information to his superiors; as a result, defendant agreed to renew the lease for one more year. The 1975 lease differed from previous leases in that it included a rider which provided in part:
If the station premises covered by this lease are sold by lessor, or if lessor shall elect to remove and/or reconstruct substantially all *461 the buildings and improvements now located on the station premises in accordance with plans it has developed therefor, then in any such event, lessor shall have the option to terminate this lease upon thirty (30) days prior written notice of such determination delivered to lessee.
On June 25, 1975 defendant sent Westfield a letter stating that defendant intended to sell the station for $259,000 and that if Westfield desired to purchase the station for that price, it should notify defendant within 30 days. Plaintiffs' attorneys responded in a letter dated July 10, 1975, objecting to the proposed sale and demanding that if defendant intended to sell the premises, plaintiffs should be relocated to another franchised service station. Defendants did not offer plaintiffs a new leasehold facility, but instead offered only stations for sale. Plaintiffs then demanded that defendant buy them out, reimbursing Galligan for his investment in both time and money. Defendant refused to do so, offering only to refund Galligan's security deposit and to buy back the gasoline which Westfield then had on hand. On January 22, 1976 defendant notified plaintiffs that the 1975 agreement would not be renewed and would be allowed to terminate on April 30, 1976. Plaintiffs commenced suit in this court on April 13, 1976 to restrain termination of the lease and to continue Westfield's tenancy under the same terms as prior to the 1975 lease and rider. Defendant represented to this court at that time that it would voluntarily refrain from terminating the tenancy or ceasing to supply Westfield with products until the return date of the order to show cause for preliminary restraints on May 3, 1976.
On April 23, 1976 defendant sought to remove this litigation to the Federal District Court on diversity grounds. Plaintiffs filed an acknowledgment of service of such petition for removal on April 28, 1976 and obtained a temporary restraining order from the Federal District Court on that date. The matter was set down for preliminary hearing on May 24, 1976 by Judge Lacey. On May 24 he granted defendant's *462 motion for summary judgment based on plaintiffs' erroneous pleading of the 1973 lease, which lease had since expired and been replaced by the 1975 extension. Judge Lacey further stated that the case involved a matter of first impression under the New Jersey Franchise Practices Act, and that the matter was more appropriately heard in the state court. The complaint was therefore dismissed without prejudice.
Plaintiff filed an amended complaint based on the 1975 lease in this court on May 26, 1976. On June 18, 1976 this court granted an interlocutory injunction enjoining defendant from terminating the tenancy of Westfield. The court further directed defendant to remove a "For Sale" sign which it had placed on the premises in question; the evidence was that the sign was posted for a total period of less than two hours.
The evidence also indicated that Westfield suffered a severe decline in sales beginning sometime in 1975. Specifically, the station sold on the average of between 27,405 and 30,390 gallons of gasoline a month during the period from 1965 through 1972 under Ditzel's management. In 1973, the first year of operation by Galligan, the station sold 348,512 gallons, or 29,042 gallons a month. In 1974 the station sold 366,638 gallons, or 30,553 gallons a month. In 1975, however, sales declined to a total of 259,927 gallons, or 21,661 gallons a month. Sales further declined in 1976 to 165,199 gallons, or 13,767 a month, and only 10,930 gallons a month for the first seven months of 1977. Westfield went out of business on July 31, 1977, and the interlocutory injunction of this court was accordingly dissolved shortly thereafter.
Defendant, for the most part, did not seriously dispute any of the factual contentions thus far enumerated. Defendant instead relied largely on the testimony of Norman D. Potter, general sales manager of the retail sales division of Cities Service since July 1, 1976, and previously regional sales manager for the area encompassing Long Island, New York *463 City, New Jersey, Pennsylvania, Delaware, Maryland, Northern Virginia, the District of Columbia and part of West Virginia (hereinafter designated as the Philadelphia region). Potter's testimony to a large extent focused on how the decision to sell the station in question was reached and how that decision fit into defendant's overall marketing strategy. This testimony was corroborated and enlarged upon by the testimony of Robert Moore, currently Vice President of Public Affairs for defendant and previously Vice President of Marketing, in a deposition admitted into evidence. I found Potter to be an honest and impressive witness. Based largely on his testimony, as well as certain testimony by other witnesses and certain documents in evidence, I find the following events to have occurred.
At the end of World War II the country found itself with many refineries originally built to satisfy wartime needs. There was at the same time a tremendous consumer demand for new automobiles. As a result, the oil industry began in the late 1940s to construct a large number of service stations. This trend continued through the 1950s and 1960s, and to some extent into the 1970s.
As time went on, however, several new forces had entered the marketplace. Most significant were the so-called independents, who offered low price and even self-service, and eventually increased their share of the national market to 30%. In New Jersey, for example, the major companies received competition from such independent marketers as Hess, Crown, Digas, Powertest and Merit. In addition, entities such as Korvette and K-Mart began to compete with gasoline retailers in the areas of TBA's and mechanical services. Competition was also experienced from various specialty shops offering tune-ups, muffler repair and so forth. A severe price war between 1970 and 1972 further weakened defendant's position.
In 1972 Cities Service had less than 2% of the nationwide market and less than 1% of all service stations. In New Jersey Cities Service had approximately 4% of the *464 market in 1972; that figure is now under 2%. Based on these figures, Potter contended, and I agree, that Cities Service should really be classified as a large independent rather than a major.
Cities Service began to analyze its position in 1972 and concluded that it was overinvested in real estate. Particular problems were created by the freezing of rents by the Economic Stabilization Act of 1970 and 1971, and by an Environmental Protection Agency requirement that each individual station be equipped with a two-stage vapor recovery device to reduce air pollution. Based on these findings Moore decided in 1972 that a program based on new acquisitions was self-destructive, and that different concepts should be tested.
In late 1972 a pilot program was instituted in Richmond, Virginia. Moore testified in his deposition that a major part of the new marketing strategy was the reduction of costs through a decrease in station density. The decision was made to close a number of stations and sell the property. The strategy also involved the conversion of a number of traditional-style stations to stations selling only gasoline at lower prices, accompanied by Cities Service-owned "Quik-Marts," convenience stores selling milk, cigarettes and certain grocery items, where studies showed this to be appropriate. Similar programs were subsequently introduced in a number of locations, including Fort Wayne, Indiana; Chicago; Long Island; Atlanta and Dade County, Florida.
Plans for New Jersey were made beginning in June 1973, and in August 1974 Potter was advised as regional manager to investigate New Jersey's retail operations. Potter was asked (1) to prepare a list of all service stations owned or leased; (2) to gather information as to each station's historical performance, and (3) to set up an evaluation committee. The committee, which included a real estate man and an economic planning representative, made two one-week trips in late 1974 to evaluate each station based on its rate of return. Stations were then designated as keep, *465 keep-dispose or dispose. The second category consisted of stations for which an alternate mode of operation was to be tried before a final decision was made.
Galligan's station was unanimously placed on the dispose list in September 1974. The final decision as to New Jersey stations was made in February 1975. Each territorial manager was then given a booklet, a copy of which was entered into evidence, describing the fate of each station. Potter testified that Galligan's station was adjudged to be in a poor location and of little potential; it is undisputed that there was no animus toward Galligan personally.
Katalenas testified to a remark allegedly made by one Louis Christodolou, one of the individuals in charge of implementing the marketing plan in the Philadelphia region from 1973 on, around the time that he distributed the disposition booklets to the salesmen, including Katalenas in late 1974. Christodolou allegedly said that "anything short of murder" could be used to implement the plan. Defendant strongly denied that such a statement was made, and pointed to a suit instituted by Katalenas against Cities Service arising out of a 1976 incident in which Katalenas was discharged for allegedly forcing a franchisee to sign an illegal mutual cancellation agreement.
The court fully realizes that the 1976 discharge and lawsuit are evidence of possible bias on the part of Katalenas. Nevertheless, after carefully evaluating the testimony and demeanor of both Katalenas and Christodolou on the stand, the court is inclined to accept as true Katalenas' representation that the statement attributed to Christodolou was in fact made. For reasons to be stated later, however, the statement by Christodolou is irrelevant to the disposition of this case.
It is undisputed that the program embarked upon by defendant was a financial success. In 1972 defendant owned 2400 stations, of which 2200 were lessee facilities. By 1977 defendant owned only 530 stations, of which at most 230 were lessee facilities. The total sales of defendant during *466 this period declined from 75 to 80 million gallons of gasoline a month in 1972 to 50 million gallons a month in 1977. Thus, defendant cut the cost of operation of owned stations by roughly 78% while decreasing sales by at most 37.5%. Defendant's profits have correspondingly increased and its financial position has been considerably strengthened.[1]
At the end of plaintiffs' case defendant moved to dismiss pursuant to R. 4:37-2(b). Applying the required standard of construction of all evidence in the light most favorable to plaintiffs, the court made two findings of fact: (1) that there was no showing of any causal relationship between the acts of defendant and plaintiffs' going out of business, and (2) that Galligan had recouped all of his original investment when this suit was commenced. The court therefore dismissed plaintiffs' demands for injunctive relief and compensatory damages, and also dismissed those counts of the complaint sounding in unjust enrichment. The only issues now left in the case are attorney's fees and punitive damages. Resolution of these issues requires the consideration of certain questions of statutory construction and constitutional law.

I. Attorney's Fees

A. Statutory Basis
R. 4:42-9(a) provides in part that "No fee for legal services shall be allowed in the taxed costs or otherwise, except * * * (8) In all cases where counsel fees are permitted by statute." The statutory basis for counsel fees in the instant case is provided by N.J.S.A. 56:10-10:
Any franchisee may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this act *467 and, where appropriate, shall be entitled to injunctive relief. Such franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees.
As noted, defendant originally intended to terminate Westfield's lease within 30 days of June 25, 1975. Only through the intervention of plaintiffs' counsel, both in seeking a settlement and ultimately in obtaining preliminary injunctive relief, was the station kept in business through July 31, 1977. Although plaintiffs went out of business on that date without help from defendant, this fact should not operate to deprive plaintiffs of the counsel fees amassed in staving off defendant's attempted termination of the lease at an earlier date.
Nor should counsel fees be limited solely to the period ending July 31, 1977. Defendant did not at that point offer to pay plaintiffs' litigation expenses. The continuation of the litigation was therefore necessary in order to establish plaintiffs' right to said counsel fees.
Plaintiffs' right to counsel fees, however, is predicated on a finding by this court that the acts attempted by defendant would in fact have violated the Franchise Practices Act. The court could not in fairness or equity require defendant to pay the counsel fees incurred in enjoining it from doing an act which would have been legal. I therefore turn to the threshold question of whether the termination of a franchise because the franchisor wishes for bona fide business reasons to dispose of the property is a violation of the Franchise Practices Act.

B. The Franchise Practices Act

1. Literal Terms
N.J.S.A. 56:10-3(a) defines "franchise" as:
* * * a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in *468 which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.
N.J.S.A. 56:10-3(c) defines a "franchisor" as "a person who grants a franchise to another person," and N.J.S.A. 56:10-3(d) defines a "franchisee" as "a person to whom a franchise is offered or granted." The parties do not dispute that a franchise relationship existed between Westfield and Cities Service, and I so find.
Defendant is specifically charged with having violated N.J.S.A. 56:10-5, which provides:
It shall be a violation of this act for any franchisor directly or indirectly through any officer, agent, or employee to terminate, cancel, or fail to renew a franchise without having first given written notice setting forth all the reasons for such termination, cancellation, or intent not to renew to the franchisee at least 60 days in advance of such termination, cancellation, or failure to renew, except (1) where the alleged grounds are voluntary abandonment by the franchisee of the franchise relationship in which event the aforementioned written notice may be given 15 days in advance of such termination, cancellation, or failure to renew; and (2) where the alleged grounds are the conviction of the franchisee in a court of competent jurisdiction of an indictable offense directly related to the business conducted pursuant to the franchise in which event the aforementioned termination, cancellation or failure to renew may be effective immediately upon the delivery and receipt of written notice of same at any time following the aforementioned conviction. It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise. [Emphasis supplied]
Reference is also made to N.J.S.A. 56:10-7, which provides in part:
It shall be a violation of this Act for any franchisor, directly or indirectly, through any officer, agent or employee, to engage in any of the following practices:
a. To require a franchisee at time of entering into a franchise arrangement to assent to a release, assignment, novation, waiver or *469 estoppel which would relieve any person from liability imposed by this act.

* * * * * * * *
e. To impose unreasonable standards of performance upon a franchisee.
f. To provide any term or condition in any lease or other agreement ancillary or collateral to a franchise, which term or condition directly or indirectly violates this act.
Under the literal terms of the act, I find that defendant's attempted actions were a violation of law. The statute permits termination of a franchise solely for "good cause," and then expressly limits good cause to the franchisee's failure to substantially comply with the franchise requirements. As noted, the recommendation that Westfield be disposed of was made in September 1974, and the final decision was made in February 1975. The testimony is largely undisputed that Westfield was still a viable operation at this time and that defendant intended to terminate the franchise regardless of Westfield's performance. There are no allegations that Galligan did not comply with the terms of the franchise agreement. Thus, the proposed termination was not for "good cause" as narrowly defined in the act and therefore contravened the act's literal requirements.
I also find that defendant violated the act in failing to provide plaintiffs with "written notice setting forth all the reasons for such termination, cancellation, or failure to renew" at least 60 days in advance. There is no evidence that such notice was ever sent. I also find that the rider attached to the 1975 lease purporting to give defendant the right to terminate upon sale on 30 days' notice was void and without effect in light of the prohibition of N.J.S.A. 56:10-7(f), quoted supra.

2. Legislative Intent
Defendant argues that the legislative intent was not to prohibit a franchisor from making a good faith decision to discontinue a particular franchise and to offer it for sale on *470 the open market, and that this intent, not the literal terms of the statute, should control.
It has been said:
In reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal reading will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter. [N.J. Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338 (1972)]
See Continental Cas. Co. v. Knuckles, 142 N.J. Super. 162, 167 (App. Div. 1976). As was stated in San-Lan Builders, Inc. v. Baxendale, 28 N.J. 148 (1958):
These regulations are to receive a reasonable construction and application, to serve the plan and course of action of the lawgiver; and in this quest for the true intention of the law, the letter gives way to the obvious reason and spirit of the expression, and to this end the evident policy and purpose of the act constitute an implied limitation on the sense of the general terms and a touchstone for the expansion of narrower terms. The will of the lawgiver is to be gathered from the object and nature of the subject matter, the contextual setting, and the mischief felt and the remedy in view. [at 155]
In order, therefore, to determine whether the act should be construed so as to include defendant's attempted actions, the court must examine the purpose of the act and the evils which the Legislature sought to correct.
N.J.S.A. 56:10-2 states:
The Legislature finds and declares that distribution and sales through franchise arrangements in the State of New Jersey vitally affects the general economy of the State, the public interest and the public welfare. It is therefore necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise arrangements.
The purposes of the act are more fully set forth in the Statement accompanying the original bill, Assembly Bill 2063 (1971):
*471 Franchising has developed into a major field of business endeavor throughout the United States. Not only is it familiar in relatively new enterprises such as fast food, lodging, specialized retailing, special auto repair and supply services and other undertakings, but franchising also is a fact of life in longer established businesses such as appliance and auto dealerships and gasoline stations. Thousands of businessmen and tens of thousands of their employees in New Jersey are affected by the operation of franchise systems.
A number of states already have moved to protect the interests of franchisors and franchisees by clearly defining the rights of each group in a matter vital to their economic existence.
New Jersey would do the same in this bill which, through the courts, would rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and nondiscriminatory standards. The bill would protect the substantial investment  tangible and intangible  of both parties in the various franchises. It would rule out economic coercion as a business tactic in this most sensitive field.
The New Jersey Legislature has been asked many times in the past to deal on a piecemeal basis with various problems growing out of the franchise relationship. This bill would provide a comprehensive statutory formula for resolving a wide range of questions growing out of the franchise relationship. [Emphasis supplied]
The type of "economic coercion" envisioned by the Legislature was described by our Supreme Court in the landmark case of Shell Oil Co. v. Marinello, 63 N.J. 402 (1973), cert. den. 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974), where the court described the relationship between an oil company and a franchised service station operator in these terms:
Shell is a major oil company. It not only controls the supply, but, in this case, the business site. The record shows that while the product itself and the location are prime factors in the profitability of a service station, the personality and efforts of the operator and the good will and clientele generated thereby are of major importance. The amount of fuel, lubricants and TBA a station will sell is directly related to courtesy, service, cleanliness and hours of operation, all dependent on the particular operator. [at 407]
The court went on to state that despite the economic benefits accruing to the franchisor from the franchisee's efforts, the franchisor has by far the greater bargaining power:
*472 Viewing the combined lease and franchise against the foregoing background, it becomes apparent that Shell is the dominant party and that the relationship lacks equality in the respective bargaining positions of the parties. For all practical purposes Shell can dictate its own terms. The dealer, particularly if he has been operating the station for a period of years and built up its business clientele, when the time for renewal of the lease and dealer agreement comes around, cannot afford to risk confrontation with the oil company. He just signs on the dotted line.

* * * * * * * *
It is a fallacy to state that the right of termination is bilateral. The oil company can always get another person to operate the station. It is the incumbent dealer who has everything to lose since, even if he had another location to go to, the going business and trade he built up would remain with the old station. [at 408-409]
It should be noted that the court found that while the transaction in question predated the act, and was therefore not controlled by it, the act "merely put into statutory form the extant public policy of this State" insofar as termination or nonrenewal for other than good cause was concerned. Id. at 409.
In Amerada Hess Corp. v. Quinn, 143 N.J. Super. 237 (Law Div. 1976), Judge Doan said:
The underlying aim of the Franchise Practices Act and Marinello, supra, is to protect the franchisee from undue usurpation of his franchise while yet allowing franchisor to protect its trade name, trademark and good will interests in the franchise agreement. With that in mind, the substantiality of a franchisee's noncompliance, as a legal concept, must be gauged in light of its effect upon or potential to affect the franchisor's trade name, trademark, good will and image which, after all, is the heart and substance of the franchising method of doing business. [at 251]
Further insight into the legislative intent may be gained from an examination of certain underlying economic realities. It is estimated that franchising accounted for over $238 billion in the sale of goods and services in 1977. This figure is 12% higher than in 1976, and more than twice the level at the start of the 1970s. In the area of retail sales, franchising accounted for $217.7 billion in 1977, or 31% *473 of the $703 billion total. Of the franchised sales, $52.7 billion's worth, or about 24%, were by gasoline stations. U.S. Dep't of Commerce, Franchising in the Economy, 1975-77, at 1-6. Franchises accounted for 80% of all gasoline sales in 1975, 1976 and 1977. Id. at 66. Abuses in the franchising field have been frequently documented. Thus, in Brown, "Franchising  a Fiduciary Relationship," 49 Tex. L. Rev. 650 (1971), the author states:
In the Nation's second largest industry, the major oil firms have their gasoline station dealers in virtual bondage, hinged on the constant threat that their short-term contracts will not be renewed unless they submit to burdensome franchisor-imposed practices. Although one may be shocked to learn that of the 225,000 gasoline station dealers the annual attrition from insolvency, termination, and failure to renew the dealership ranges from twenty-five to forty percent, this decimation would appear predictable from the conditions that prevail.
Just prior to World War II, in response to widespread national and local measures designed to discourage chainstore operations, the major oil companies adopted the so-called Iowa Plan under which the company utilized its economic strength to obtain choice economic sites, constructed stations with little regard to their economic viability, and then leased the premises to dealers on the condition that they handle the company's gasoline and related products. The proliferation of these company-leased stations and the preemption of almost all the good locations has led to the common sight of several stations at every available intersection with the operators helpless to satisfy the oil company's drive to obtain a satisfactory return on its unwise investment. [at 655-656, footnotes omitted]
In light of these economic conditions, many commentators have criticized as inadequate the theory permitting termination or nonrenewal as long as the franchisor acts in good faith. Thus Professor Gellhorn states:
Analytically, the terminating party's motives are unrelated to the harshness of the bargain or of its effect. Motives have no relationship to the parties' relative bargaining power. Nor would the application of a good faith test be affected either by whether the dominant party was misusing its power or by whether termination would have unduly harsh effects on the terminated party. Rather, its application would be determined by the extent to which *474 such misuse was disclosed by improper motives. The assumption, in other words, seems to be that fairness can be assured (or fundamental unfairness prevented) by attention to the motives upon which a party acts. Not only is empirical support for this assumption lacking, but it also seems contrary to common sense. There is no evidence that a weaker party would be protected adequately by requiring the dominant party to exhibit proper motives in exercising the power to terminate. For example, would a termination for the sole purpose of furthering the economic self-interest of the terminating party be evidence of lack of good faith? Probably not. But it cannot be seriously questioned that such a termination may nevertheless have substantial unfair effects on the terminated party's business. Conversely, bad faith motives may not result in any unfairness to the terminated party. On the other hand, the case against good faith conditions is easily overstated. At least in the cases in which it has been applied, there is little question that but for the good faith limitation the terminations would have caused the terminated parties to suffer substantial losses. [Gellhorn, "Limitations on Contract Termination Rights  Franchise Cancellations," 1967 Duke L.J. 465, 504-505]
Similarly, a student author comments:
Although the franchisor may not be acting in bad faith in asserting its interests, its far superior bargaining position enables it to set these terms unilaterally, leaving the franchisee with the Hobson's choice of acquiescence or loss of its investment. If the legislative determination that franchisees need special protection is to be effectuated, franchisees should be protected from their own agreements even where the franchisor is acting with complete good faith. [Note, 74 Colum. L. Rev. 1487, 1493 (1974)]
The author points out that frequently the legitimate interests of franchisor and franchisee differ:
Since the former often deals at wholesale prices generally fixed nationwide, its profits are directly proportional to national sales volume and relatively insensitive to local market conditions. The latter, on the other hand, may be so limited by the manufacturer's requirements  sales quotas, hours of operation and promotional activities  that he may be unable to lower prices to effectively compete at the local level or cut costs of operation to keep profits stable. The result is that the franchisee may work longer hours, spend more on advertising, promotion and wages, and sell more of the franchisor's product without a commensurate increase in his profits. [at 1493, n. 59]
*475 Based on these factors, I find that the legislative purpose would be defeated by limiting operation of the act, as defendant would apparently have me do, to terminations which are arbitrary and capricious or in bad faith. Where the legitimate economic interests of the franchisor and franchisee are at variance with one another, the franchisor with its grossly disproportionate bargaining power will virtually always prevail. The Franchise Practices Act, I find, was intended to rectify this lack of equal bargaining power. Should the act be construed so as to permit termination or nonrenewal whenever it is to the franchisor's economic advantage, much of the purpose of the act would be defeated.
Furthermore, it must be remembered that the initial decision to grant a franchise is made by the franchisor. Once the decision has been made, most of the financial risk is assumed by the franchisee. If the franchisor should decide that its original decision was mistaken, and that the franchise should be terminated, it could do so at minimal expense to itself but at the cost of potentially great harm to the franchisee. I find the act to be a remedial measure which should be broadly construed to prevent the unfair result described above. See Service Armament Co. v. Hyland, 70 N.J. 550, 559 (1976); Carianni v. Schwenker, 38 N.J. Super. 350, 361 (App. Div. 1955); Global Amer. Ins. Managers v. Perera Co., 137 N.J. Super. 377, 386 (Ch. Div. 1975), aff'd o.b., 144 N.J. Super. 24 (App. Div. 1976).
The court therefore concludes that the Franchise Practices Act, both by its express terms and in its intent, encompasses a situation in which a franchisor seeks to terminate a franchised location for entirely bona fide economic purposes.

3. Constitutional Questions
Defendant contends that should the act be construed so as to prohibit it from disposing of its property, the result would be violative of both the Due Process Clause and the Commerce Clause of the United States Constitution.

*476 a. Due Process clause
The Fourteenth Amendment of the United States Constitution provides in part: "No state shall * * * deprive any person of life, liberty, or property, without due process of law * * *."
The court initially notes that it must be guided by the principles set forth by Justice Francis writing for the court in N.J. Sports and Exposition Auth. v. McCrane, 61 N.J. 1 (1972), aff'd after remand, In re Sports Complex in Hackensack Meadowlands, 62 N.J. 248 (1973), app. dism. 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972):
One of the most delicate tasks a court has to perform is to adjudicate the constitutionality of a statute. In our tripartite form of government that high prerogative has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives. As a result, judicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature. As we noted in Roe v. Kervick, 42 N.J. 191, 229 (1964), all the relevant New Jersey cases display faithful judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised by the Legislature to serve a public purpose conform to the Constitution. And these cases project into the forefront of any judicial study of an attack upon a duly enacted statute both the strong presumption of validity and our solemn duty to resolve reasonably conflicting doubts in favor of conformity to our organic charter. Moreover, the conclusions reached in such cases demonstrate that in effectuating this salutary policy, judges will read the questioned statute as implying matters requisite to its constitutional viability if it contains terms which do not exclude such requirements.
The judicial branch of the government does not and cannot concern itself with the wisdom or policy of a statute. Such matters are the exclusive concern of the legislative branch, and the doctrine is firmly settled that its enactment may not be stricken because a court thinks it unwise. [61 N.J. at 8]
See Grand Union v. Sills, 43 N.J. 390, 397 (1964); Lynch v. Edgewater, 8 N.J. 279, 290-291 (1951); Davis v. Heil, *477 132 N.J. Super. 283, 289 (App. Div. 1975), aff'd o.b. 68 N.J. 423 (1975).
"There is a presumption of the constitutional sufficiency of a legislative enactment; and the onus of a showing contra is on him who interposes the challenge." Jamouneau v. Harner, 16 N.J. 500, 515 (1954), cert. den. 349 U.S. 904, 75 S.Ct. 580, 99 L.Ed. 1241 (1955).
A constitutional prohibition against the exercise of a particular power is in the nature of an exception, and it is the settled rule of judicial policy in this State that a legislative act will not be declared void unless its repugnancy to the constitution is clear beyond reasonable doubt. [Gangemi v. Berry, 25 N.J. 1, 10 (1957)]
The applicable principles for determining whether there is a violation of the Due Process Clause were first set forth in Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). There the court said:
Under our form of government the use of property and the making of contracts are normally matters of private and not public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. [291 U.S. at 523, 54 S.Ct. at 510, 78 L.Ed. at 748-749]
The court went on to state:
No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.
The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects State action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the *478 guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. [291 U.S. at 525, 54 S.Ct. at 510, 78 L.Ed. at 949-950; footnotes omitted]
The Nebbia court specifically stated by way of example:
The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain types of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. * * * And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreement, are within the state's competency. [291 U.S. at 527, 54 S.Ct. at 512, 78 L.Ed. at 951-952; footnotes omitted]
Our own Supreme Court has said:
A state may, in the exercise of the police power, enact a statute to promote the public health, safety, morals or general welfare. Such a statute, because of retroactive application or otherwise, may diminish in value or totally destroy an individual's right, whether in property as such or arising out of contract, provided that the public interest to be promoted sufficiently outweighs in importance the private right which is impaired. [Rothman v. Rothman, 65 N.J. 219, 225 (1974)]
See Reingold v. Harper, 6 N.J. 182, 193-95 (1951). Similarly, in Jamouneau v. Harner, supra, the court said:
The basic right of private property perforce yields to an overriding public need. There is an ever-increasing demand for accommodation of the right of property and of contract to the inexorable needs and pressures of our complex economy and intricate social organism. The vital community interest is paramount. Utility rate contracts give way to this attribute of sovereign power; and the contractual arrangements between landlords and tenants as well. The determinative question is whether the police power has been exercised for an end which is in fact public. [16 N.J. at 514]
Applying these principles, it is clear that the Franchise Practices Act is not on its face violative of due process. *479 Our Supreme Court has specifically found franchising practices, especially as they affect the supply and distribution of motor vehicle fuels, to be closely intertwined with the public interest. See Shell Oil Co. v. Marinello, supra, 63 N.J. at 409. The evils which give rise to the act have been fully outlined above. The Legislature could reasonably have determined that a major cause of the unequal bargaining power of the franchisor and franchisee was the former's ability to inflict great economic harm on the latter through termination or nonrenewal. The Legislature's decision to restrict the franchisor's right to terminate to those instances in which the franchisee has substantially failed to comply with the franchise agreement is at least arguably a reasonable means for redressing this imbalance, and that precludes a finding by this court that due process is violated.
Defendant contends, however, that the act deprives it of due process if it is interpreted so as to prevent defendant from ever disposing of its property so long as the franchisee chooses to remain there. Indeed, defendant argues, since both the franchisor and franchisee in this case were corporations the result might be to foreclose defendant's right to sell its property forever.
This argument is persuasive. In Sabato v. Sabato, 135 N.J. Super. 158 (Law Div. 1975), the court held that the portion of the Fair Eviction Notice Act, N.J.S.A. 2A:18-61.1, prohibiting the eviction of any lessee or tenant for other than certain carefully delineated grounds stated to constitute "good cause" was invalid insofar as it prohibited a lessor from himself occupying the premises. The court said "`Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.'" Id. at 173 (quoting United States v. Causby, 328 U.S. 256, 262, n. 7, 66 S.Ct. 1062, 1066, n. 7, 90 L.Ed. 1206, 1211, n. 7 (1945)). In short, a "regulation which deprives an owner of `all or *480 most of his interest' is also condemned as an unreasonable exercise of the police power." 135 N.J. Super. at 173.
Note should also be taken of Consumer Oil Corp. of Trenton v. Phillips Petroleum Co., 488 F.2d 816 (1973). In that case the Third Circuit declined to decide whether the act prohibited a franchisor from completely withdrawing from its entire northeast marketing area, including New Jersey, holding that there were substantial constitutional questions involved:
For it is arguable that to prohibit a franchisor from discontinuing all business within the state would unreasonably burden commerce, or deprive the franchisor of liberty or property without due process of law, or both. And if an imposed obligation to continue marketing in New Jersey is thought to be justified by the franchisor's election to grant or renew franchises in the State with knowledge of the statutory requirement, the doctrine of `unconstitutional conditions' may well be invoked against the statute. Whether or not such attacks would prevail, we are persuaded that they would not be frivolous.
Since these constitutional questions are substantial and the New Jersey courts might interpret the statute in a way that would avoid them, we think it appropriate that the federal courts abstain from deciding the merits of the present controversy at this time. [at 819; footnotes omitted]
The constitutional problems raised by a total prohibition on sale, then, would be substantial. It is well established that "[e]ven though a statute may be open to a construction which would render it unconstitutional or permit its unconstitutional application, it is the duty of this Court to so construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation." State v. Profaci, 56 N.J. 346, 350 (1970). "`[O]f two interpretations of the language of a statute the one that renders the act constitutional will be deemed to express the legislative intent.'" Clifton v. Passaic Cty. Bd. of Taxation, 28 N.J. 411, 422 (1958).
The court is thus faced with the task of construing the act so as to effect the intent of the Legislature, which I have found to be the exclusion of bona fide business purpose *481 without more from the "good cause" required for nonrenewal or termination of a franchise in light of the constitutional problems raised by indefinitely foreclosing a franchisor from disposing of its property. I conclude that this can best be accomplished by construing the act so as to permit a franchisor to fail to renew (but not to cancel) a franchise in order to dispose of the property, but to require the franchisor in such case to pay the franchisee the reasonable value of his business. Cf. Senate Bill 2335, 94th Cong., 1st Sess. § 6(b)(2) (1975), the proposed federal "Fairness in Franchising Act," which provides that "[a] franchisor who fails to renew for a legitimate business reason shall pay to the franchisee involved a reasonable compensation for the value to the latter's business, including, but not limited to, goodwill."
Such reasonable value is not necessarily dependent on the amount originally invested by the franchisee. Rather, it should constitute reimbursement for the actual value of the franchisee's business when the franchisor seeks to terminate it through nonrenewal. This is wholly in keeping with the observation of our Supreme Court in Marinello, quoted supra, that "the personality and efforts of the operator" of a franchised service station and "the good will and clientele generated thereby are of major importance" in the profitability of the station. 63 N.J. at 407. The Marinello court found the amount of products sold to be "directly related to courtesy, service, cleanliness and hours of operation, all dependent on the particular operator." Id. As the court also observed, "[i]t is the incumbent dealer who has everything to lose since, even if he had another location to go to, the going business and trade he built up would remain with the old station." Id. at 409.
Such a construction would also be in keeping with the prior observation of this court that the economic interests of the franchisee and franchisor may differ. A location which may be profitable for the franchisee and may in fact be his sole means of support may nevertheless not figure into the *482 long-range business plans of the franchisor. To permit the franchisor to terminate the franchise and sell the property, and thus deprive the franchisee of his means of livelihood, would be to give the party with the greatly superior bargaining power the option to deal with the other party solely upon consideration of its own economic advantage. As I have found, it is precisely this grossly inequitable situation which the act was intended to prevent. By requiring the franchisor to reimburse the franchisee in such a case, the court believes it can carry out the stated intent of the Legislature to "protect the substantial investment  both tangible and intangible  of both parties" while avoiding the constitutional problems which might otherwise arise. I find this interpretation to be both equitable and sensible, and will decide the case accordingly.

b. Commerce Clause
The court must first consider, however, whether the act, as construed, is violative of the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3. The applicable principles were set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), where the United States Supreme Court said:
Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. Huron Cement Co. v. Detroit, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852, 856 (1960). If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. [397 U.S. at 42, 90 S.Ct. at 847, 25 L.Ed.2d at 178] *483 See also, Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 370-372, 96 S.Ct. 923, 927-928, 47 L.Ed.2d 55, 60-61 (1976).
Our own Supreme Court has adopted a three-part test basically the same as that employed by the federal courts: (1) whether the state legislature acted within its province; (2) whether the means of regulation chosen are reasonably adopted to the end sought, and (3) "whether the burden imposed on interstate commerce by the state statute exceeds or outweighs the benefit accruing to the state." Hackensack Meadowlands Develop. Comm'n v. Municipal Sanitary Landfill Auth., 68 N.J. 451, 474 (1975), vacated & remanded on other grounds sub nom. Philadelphia v. New Jersey, 430 U.S. 141, 97 S.Ct. 987, 51 L.Ed.2d 224 (1977), aff'd on remand, 73 N.J. 562 (1977), prob. jurisdiction noted, 430 U.S. 141, 97 S.Ct. 987, 51 L.Ed.2d 224 (Sup. Ct. 1977).
I have already found that the Legislature acted within its province in passing the Franchise Practices Act, and that the act, as construed by this court, is reasonably adopted to the ends sought. The only question remaining is whether the benefit to the State is exceeded by the burden on interstate commerce. I find that it is not.
It should first be noted that the act does not discriminate against out-of-state businesses vis-a-vis local businesses. The act applies equally to all franchisors, in and out of the State. Further, the act does not prevent any produce or goods from moving interstate. The only effect on interstate commerce is to require those franchisors deciding to sell their products in New Jersey through a franchisee to deal with the franchisee according to certain reasonable restrictions and thus safeguard the franchisee's legitimate property interests in the franchise.
When the franchisor chooses to do business in the State through the use of a franchise, with the substantial advantages thereof, the State may impose reasonable restrictions on the franchisor to protect the legitimate interests *484 of the franchisee. Under the act as I have construed it, the franchisor is not forced to do business in the State indefinitely. Whatever incidental burden may be imposed on interstate commerce by the act, I find that it is substantially outweighed by the benefit to the State. The act must therefore be upheld against defendants' Commerce Clause argument.

C. Applicability
Having determined the act's validity, the court must now apply it to the facts of this case. As noted, the initial determination to sell the Westfield property was made in September 1974, and the final decision was made in February 1975. Defendant notified Westfield of the intended termination of the franchise in June 1975. Plaintiffs first unsuccessfully sought a new franchise location and then requested that defendant buy them out. This defendant at all times refused to do. Defendant similarly refused to buy plaintiffs out when it notified plaintiffs of its intent not to renew when the lease expired on April 30, 1976.
Although the evidence indicated that Westfield's business was in a decline beginning sometime in June or July 1975, it is nevertheless true that the business was worth something beyond its physical assets at all relevant times through the beginning of this suit in April 1976. I find that defendant had no right to terminate the franchise without offering to reimburse Westfield for the full value of the business. This figure is not necessarily linked to Galligan's original monetary investment in the station, which, as was noted, had been fully recouped when this suit was instituted. Rather, defendant should have offered the total value of the business, including good will, at the time defendant sought to terminate the franchise.
From what has been said it therefore follows that defendant's attempted termination of the franchise, by cancellation in June 1975 or by nonrenewal in April 1976, *485 would have been a violation of the Franchise Practices Act. This is especially true in light of defendant's failure to provide the written notice required by N.J.S.A. 56:10-5. It was necessary for plaintiffs to retain counsel and institute this suit to restrain such violation. The injunction which kept Westfield in business through June 1977 prevented a violation of the act during that period. I therefore hold that plaintiffs are entitled to reasonable counsel fees plus costs of litigation in this suit.

II. Punitive Damages

The court has determined that defendant sought to violate plaintiffs' legal rights, but that no actual damage resulted, since an injunction kept Westfield in business until it closed for reasons unrelated to any action by defendant. Nevertheless, where a legal right has been violated, the law will infer nominal damages even in the absence of actual loss. Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90, 96-97 (Sup. Ct. 1936). In such a case punitive damages may be awarded. Winkler v. Hartford Acc. & Ins. Co., 66 N.J. Super. 22, 29 (App. Div. 1961), certif. den. 34 N.J. 581 (1961). The court must therefore determine whether punitive damages are appropriate in this case.
Our Supreme Court has recently discussed punitive damages in depth in Leimgruber v. Claridge Associates, Inc., 73 N.J. 450 (1977). In that case Chief Justice Hughes said for a unanimous court:
Punitive or exemplary damages are sums awarded apart from compensatory damages and are assessed when the wrongdoer's conduct is especially egregious. They are awarded upon a theory of punishment to the offender for aggravated misconduct and to deter such conduct in the future. Fisher v. Volz, 496 F.2d 333, 347 (3d Cir.1974); DiGiovanni v. Pessel, 55 N.J. 188, 190 (1970); Berg v. Reaction Motors Div., 37 N.J. 396, 412-13 (1962); Trainer v. Wolff, 58 N.J.L. 381, 382 (E. & A. 1895); Belinski v. Goodman, 139 N.J. Super. 351, 359 (App. Div. 1976); Cabakov v. Thatcher, 37 N.J. Super. 249, 259 (App. Div. 1955); Hulbert v. Arnold, 83 N.J.L. 114, 117 (Sup. Ct. 1912); Dobbs, Remedies § 3.9, at 205 *486 (1973); McCormick, Damages § 77 (1935); Prosser, Torts § 2, at 9 (4th ed. 1971); Restatement (Second) of Torts § 908(1), Comment a (Tent. Draft No. 19, 1973). [at 454-455]
The court went on to say:
The decision to award exemplary damages and the amount thereof rests within the sound discretion of the trier of fact. Fisher v. Volz, supra; Cabakov v. Thatcher, supra; Dobbs, Remedies § 3.9, at 218 (1973); Restatement (Second) of Torts § 908, Comment d (Tent. Draft No. 19, 1973). In assessing such damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of the damages. Restatement (Second) of Torts § 908(2) (Tent. Draft No. 19, 1973); 22 Am. Jur.2d Damages § 263 (1965).

* * * * * * * *
Despite the lack of an established standard by which the amount of punitive damages may be fixed, the general doctrine is that the exemplary damages awarded must bear some reasonable relation to the injury inflicted and the cause of the injury. But the obvious proposition that the amount of damages should be related to the severity of the wrongful conduct and the scope of the resulting injury does not provide much meaningful guidance for setting the amount of the award, and certainly does not call for a fixed ratio between compensatory and punitive damages awarded. [at 456-457]
In considering punitive damages there are two grounds upon which to award them  (1) actual malice or (2) an act accompanied by a wanton and wilful disregard of the rights of another. Cf. Berg v. Reaction Motors Div., 37 N.J. 396, 413 (1962). The requirement of wilfulness or wantonness must come from a positive element of conscious wrongdoing which can be satisfied by "showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Id. at 414.
Exemplary damages are generally "awarded only `where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated *487 with crime.'" Security Corp. v. Lehman Assoc. Inc., 108 N.J. Super. 137, 142 (App. Div. 1970).
In the instant case I find the element of wanton and wilful wrongdoing to be lacking. Although I believe that Christodolou did state that "anything short of murder" could be used to implement defendant's New Jersey marketing strategy in late 1974, I also find that the actions of defendant were not carried out in accord with this philosophy. Particular emphasis must be placed on defendant's decision to renew Westfield's lease, albeit with the rider giving defendant the right to terminate upon sale, in 1975 based on Galligan's representations about the size of his investment. I further find that defendant deferred its initial decision to terminate in the middle of the 1975 lease term to the end of the term in April 1976. These actions, I find, speak more loudly than Christodolou's words.
The court also notes that defendant was at all times motivated by good faith business purposes, and not by any animosity or malice toward Galligan. Although this court has ultimately determined otherwise, I believe that defendant did not originally feel that its conduct would violate the act. And while good faith does not insulate a franchisor from liability under the act, it should protect defendant from punitive damages.
Defendant's conduct, while legally wrongful, was not wantonly and maliciously so. Punitive damages must therefore be denied. Plaintiffs' damages are limited to costs of suit, including reasonable counsel fees, and plaintiffs shall file an appropriate claim with this court.
NOTES
[1] These figures do not include approximately 4500 stations owned by independent distributors who merely buy gasoline from Cities Service.