WESTFIELD CENTRE SERVICE, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND JAMES GALLIGAN, INDIVIDUALLY AND AS PRESIDENT OF WESTFIELD CENTRE SERVICE, INC., PLAINTIFFS-RESPONDENTS, v. CITIES SERVICE OIL COMPANY, A DELAWARE CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANT-APPELLANT.

Argued February 9, 1981—Decided June 29, 1981.

454

*Andrew S. Polito* argued the cause for appellant (*Mattson, Madden & Polito*, attorneys; *Andrew S. Polito* and *Frank D. Angelastro*, of counsel and on the briefs).

*Vincent K. Loughlin* argued the cause for respondents (*Johnstone & O'Dwyer,* attorneys.)

The opinion of the Court was delivered by

SCHREIBER, J.

In this case we are called upon to interpret sections of the Franchise Practices Act (Act), *N.J.S.A.* 56:10–1 *et seq.*, relative to the termination of a franchise, *N.J.S.A.* 56:10–5, and the remedies, including attorneys' fees, available to a franchisee upon termination, *N.J.S.A.* 56:10–10. Interrelated with these interpretive questions are constitutional due process and equal protection issues.

These various problems arose out of an action instituted by Westfield Centre Service, Inc. (Westfield Centre), and James Galligan, its director, officer and sole shareholder, against Cities Service Oil Co. (Cities Service) to enjoin its sale of the property on which plaintiff's gasoline station was located, to continue its franchise arrangement with Cities Service, and to collect compensatory and punitive damages and attorneys' fees. The trial court granted a temporary injunction preventing sale of the property and termination of the franchise. While the suit was pending, the station was closed and the complaint was amended to seek additional damages for plaintiffs' having been forced out of business. The trial court, which had vacated the injunction, dismissed the plaintiffs' claims for damages but awarded plaintiffs attorneys' fees pursuant to *N.J.S.A.* 56:10–10. 158 *N.J.Super.* 455 (Ch.Div.1978), supp. 162 *N.J.Super.* 114 (Ch.Div.1978).

Defendant appealed, asserting *inter alia* that the trial court's interpretation of the termination and remedial clauses was unconstitutional. The Appellate Division accepted the trial court's holding of constitutionality and interpretation of the statutory provisions involved, but remanded the matter for a recalculation of plaintiffs' attorneys' fees. 172 *N.J.Super.* 196 (App.Div.1980). This Court granted defendant's petition for certification concerning the construction and constitutionality of

the termination and remedy provisions in the Act and denied plaintiffs' cross-petition with respect to the remand for recalculation of attorneys' fees. 85 *N.J.* 92 (1980).

I

The detailed facts are set forth in the trial court's initial decision, 158 *N.J.Super.* 455, and need not be repeated here except to the extent required for an understanding of the issues raised on this appeal. The focus of this dispute is a retail gasoline service station located on land owned by Cities Service in Westfield. It operated in a traditional manner, offering gasoline, making repairs, and selling tires, batteries and accessories. James Galligan, who had worked as a part-time attendant at the station for 20 years, organized Westfield Centre to purchase the business. The seller, a corporation wholly owned by Raymond Ditzel, was a lessee-franchisee of Cities Service, marketing gasoline under the trade name of Citgo. On May 1, 1973 the sale was consummated. The purchase price totalled $35,000, of which $18,673 was allocated for accounts receivable, $5,870 for inventory, $2,457 for equipment and $8,000 for goodwill. Ditzel's salary during the two previous years had been $17,260 and $13,515 and the corporate profits had been nominal.

In conjunction with the purchase, plaintiff entered into several agreements with Cities Service. An equipment lease covered tanks, pumps and other related personalty. A credit card agreement provided for the handling of Citgo credit cards. A products agreement involved the sale of Cities Service gas and oil and a periodic payment plan and security agreement governed the terms of payment for gasoline and rent. Lastly, there was a station lease of the property and improvements. The lease term was 12 months commencing May 1, 1973, automatically renewable annually thereafter unless, at least 90 days prior to April 30, either party gave notice of termination. The time periods of all other agreements were coordinated with the lease.

New agreements in substantially the same form were executed for the year beginning May 1, 1975. The one significant difference was the addition of a provision that stated in part that

> [i]f the station premises covered by this Lease are sold by Lessor, or if Lessor shall elect to remove and/or reconstruct substantially all the buildings and improvements now located on the station premises in accordance with plans it has developed therefor, then in any such event, Lessor shall have the option to terminate this Lease upon thirty (30) days' prior written notice of such termination delivered to Lessee.

On June 25, 1975, Cities Service notified Westfield Centre by letter that Cities Service proposed to offer to sell the station property for $259,000. The letter further stated:

> Please advise if you are interested in purchasing the property. If we do not hear from you within 30 (thirty) days, we will consider that you have no interest in purchasing the property and it will be placed for sale on the open market.

Plaintiffs objected to the proposed sale. On January 22, 1976, Cities Service advised plaintiffs that the lease and other agreements, all expiring by their terms on April 30, 1976, would not be renewed.

Plaintiffs commenced suit in April 1976 in the Superior Court, Chancery Division, for an order enjoining defendant from proceeding with the sale and from interfering with plaintiffs' use of the property and for an order directing defendant to renew the lease and pay compensatory and punitive damages and attorneys' fees. Defendant thereupon removed the case to the United States District Court. In May 1976, the district court granted defendant's motion for summary judgment, noting that the suit was based on a superseded 1973 lease and that in any event abstention was appropriate to enable the state courts to interpret the statute.

Following institution of this action on May 26, 1976, the trial court granted an interlocutory injunction restraining Cities Service from interfering with plaintiff's tenancy and from disposing of its ownership interest in the leased premises and directing defendant to continue to supply products to Westfield Centre. On July 31, 1977, Westfield Centre went out of business and the

restraints were dissolved shortly thereafter. The demise of the business had been foreshadowed for some time, gasoline sales having declined sharply commencing in 1975 until the station closed in July 1977.

The evidence presented at trial disclosed that when he purchased the business, Galligan invested $10,000 of his own funds, and borrowed $20,000 from a bank and $5,000 from the seller. The loans were repaid from the business. In the fiscal year ending April 30, 1974, his first year of operation, Galligan drew a salary of $23,000 and the corporation earned a net profit of $11,326. In subsequent periods as the business declined, Galligan advanced additional funds to Westfield Centre. Westfield Centre's accountant testified that Galligan would have recouped his investment if the corporation had ceased operating and liquidated as of April 30, 1976. Utilizing a formula devised by the Internal Revenue Service, the accountant calculated that on the basis of Westfield Centre's operations, it had no goodwill as of the date it ceased functioning.

At the close of plaintiffs' case defendant moved for involuntary dismissal. The trial court found that plaintiff Galligan had recouped his initial $35,000 investment and there was no evidence of a causal relationship between defendant's attempts to sell the land and the station's closing. The court accordingly dismissed plaintiffs' claim for compensatory damages and damages based on unjust enrichment, leaving plaintiffs' claim for punitive damages and attorneys' fees. The claim for injunctive relief was dismissed as moot.

Most of the evidence presented in defendant's case concerned its reasons for deciding to sell the station property. In 1972, after experiencing two negative earnings years in its retail gasoline division, Cities Service analyzed its position and concluded that it was overinvested in real estate. As a result of this analysis the company launched pilot programs in states other than New Jersey to sell some stations and convert others to gasoline-only stations or gasoline with a small convenience

store. The projects were successful and in 1974 the decision was made to implement the concept in New Jersey. In October 1974 an evaluation committee visited all Cities Service-owned stations in New Jersey and classified them as "keep," "dispose" or "keep-dispose," the latter classification occurring where the recommendation was not unanimous. Plaintiffs' station was classified "dispose" because a gasoline station at that location was not economically feasible. The committee's recommendation was accepted in February 1974 and was implemented by attempts to sell the property.

The trial court held that defendant had violated the Franchise Practices Act since good faith business reasons were not "good cause" justifying termination under *N.J.S.A.* 56:10–5. However, the court interpreted this provision to permit nonrenewal by a franchisor choosing to dispose of its property, so long as the franchisor compensated the franchisee for the reasonable value of the franchisee's business as of the date the franchisor sought to terminate the arrangement through nonrenewal. 158 *N.J.Super.* at 481. The court found no basis for punitive damages, and limited plaintiffs' recovery to costs of suit, including reasonable counsel fees. *Id.* at 484–487.

Thereafter a hearing was held with respect to counsel fees. At its conclusion the court awarded plaintiffs $25,865 in counsel fees and $1,700 in costs, pursuant to *N.J.S.A.* 56:10–10, for their successful efforts in obtaining injunctive relief prior to trial and upholding the validity of the statute. It included legal services rendered in the federal suit. 162 *N.J.Super.* 114 (Ch.Div.1978).

The Appellate Division affirmed the trial court's conclusion that the statute was valid. It found that since the only benefit enjoyed by plaintiffs was the injunction permitting the station's continued operation between August 1976 and July 1977, attorneys' fees should be limited to the efforts of counsel expended in obtaining the injunctive relief and supporting the validity of the statute. 172 *N.J.Super.* 196, 204–205 (App.Div.1980). Plaintiffs were not entitled to fees on issues resolved against them.

Accordingly, the matter was remanded to determine the fair value of those services. *Id.* at 205.

## II

Franchising, as a method of distribution, has become a significant part of the economy in this country. In the last decade franchises have expanded from approximately 384,000 franchises with annual gross sales of $113 billion in 1969 to 476,000 with annual gross sales of $376 billion in 1981. *U. S. Dept. of Commerce, Franchising in the Economy* 1979–1981 at 1, 23–28 (1981).

In a traditional franchise relationship the franchisee acquires the right to market products or services under the franchisor's name and trademark.[1] *Id.* at 1. This arrangement has significant advantages for both parties. The franchisor obtains a distribution system without the burden of day to day operations of retail establishments and an opportunity to expand with less capital expenditure than would otherwise be required. The franchisee gains his "own" business with access to an established brand, tested marketing techniques and advertising. Both parties also have investments in the relationship: the franchisee in time and money; the franchisor in reputation, property, image of quality of its products or services and marketing technique. Both are interested in the financial success of the venture. *M. Mendelsohn, The Guide to Franchising* 17–24 (1970); Chisum, "State Regulation of Franchising: The Washington Experience," 48 *Wash.L.Rev.* 291, 295–296 (1973).

Though economic advantages to both parties exist in the franchise relationship, disparity in the bargaining power of the parties has led to some unconscionable provisions in the agree-

---

[1] In a newer type of franchising known as business format franchising, the franchisor provides not only its product and trademark but also its marketing strategy, operating manuals, quality control and communications system. This type of arrangement is particularly prevalent in fast food and business services franchising. *Franchising in the Economy, supra* at 3.

ments. Franchisors have drafted contracts permitting them to terminate or to refuse renewal of franchises at will or for a wide variety of reasons including failure to comply with unreasonable conditions. Some franchisors have terminated or refused to renew viable franchises, leaving franchisees with nothing in return for their investment. Others have threatened franchisees with termination to coerce them to stay open at unreasonable hours, purchase supplies only from the franchisor and at excessive rates or unduly expand their facilities. *Hearings on S. 2335 Before the Comm. on Commerce,* 94th Cong., 2d Sess. (1976); *Hearing on Assembly Bill No. 2063 (Franchise Practices Act) Before the New Jersey Legislature Assembly Judiciary Committee* (March 29, 1971); Chisum, *supra,* 48 *Wash.L.Rev.* at 297–298.

This Court has recognized the unequal bargaining power between franchisor and franchisee in the motor fuel business. In *Shell Oil Co. v. Marinello,* 63 *N.J.* 402 (1973), we considered franchise agreements whereby Shell had the right to terminate its business relationship with a service station operator on ten days notice. Writing for the Court, Justice Sullivan held that the provisions giving Shell the right to terminate without good cause were inserted as a "result of Shell's disproportionate bargaining position and [were] grossly unfair." *Id.* at 409. Finding the distribution and sale of motor fuels affected with a public interest, he declared the clauses void as against public policy.[2] *Id.* at 409–411.

The New Jersey Legislature was sensitive to the overall problem and enacted the Franchise Practices Act effective December 21, 1971 with respect to franchises granted or renewed

---

[2] *Marinello* was decided after the enactment of the Franchise Practices Act, but the franchise agreement involved had been entered into before the effective date of the statute. Therefore the statute did not apply. See *N.J.S.A.* 56:10–8.

after that date.[3]   See *N.J.S.A.* 56:10–8.   The Legislature declared in the Act that

> distribution and sales through franchise arrangements in the State of New Jersey vitally affects the general economy of the State, the public interest and the public welfare. It is therefore necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise arrangements. [*N.J.S.A.* 56:10–2]

The legislative statement accompanying the Act acknowledged the economic importance of franchising and noted that other states had adopted legislation defining the rights of the parties.   The statement continued, stating:

---

[3]Some states, like New Jersey, have adopted laws pertaining to termination and nonrenewal of franchises in all businesses. See, *e. g., Ark.Stat.Ann.* § 70–807 *et seq.* (1979); *Conn.Gen.Stat.Ann.* § 42–133e *et seq.* (West Supp. 1981); *Del.Code* tit. 6, § 2551 *et seq.* (1975 & Supp.1980); *Haw.Rev.Stat.* § 482E–1 *et seq.* (1976 & Supp.1979); *Ill.Ann.Stat.* ch. 121½, § 701 *et seq.* (Smith-Hurd Supp.1980); *Ind.Code Ann.* § 23–2–2.7–1 *et seq.* (Burns Supp. 1980); *Va.Code* § 13.1–557 *et seq.* (1978 & Supp.1980); *Wash.Rev.Code Ann.* § 19.100.010 *et seq.* (1978 & Supp.1981); *Wis.Stat.Ann.* § 135.01 *et seq.* (West 1974 & Supp.1980). Many jurisdictions have enacted statutes dealing with franchises in a particular industry, notably petroleum and automobiles. See, *e. g., Cal.Bus. & Prof.Code* § 20999 *et seq.* (West Supp.1981); *Ga.Code Ann.* § 106–1101 *et seq.* (Supp.1980); *Ky.Rev.Stat.* § 190.010 *et seq.* (1980); *Mass. Ann.Laws* ch. 93B, 93E (Michie/Law. Co-op. 1975 & Supp.1981); *Neb.Rev. Stat.* § 60–1401.01 *et seq.* (1978).

After the trial of this case the federal government enacted the Petroleum Marketing Practices Act, 15 *U.S.C.* § 2801 *et seq.*, which relates to franchises involving motor fuel and permits termination or nonrenewal of franchises without any compensation to the franchisee when the terms are three years or more, provided the franchisor in good faith and in the normal course of business decides to withdraw from the relevant geographic market, 15 *U.S.C.* § 2802(b)(2)(E), or to sell the premises, 15 *U.S.C.* § 2802(b)(3)(D). Two predecessor bills would have provided compensation for the value of the franchisee's business, including goodwill, in the event of termination or nonrenewal for a legitimate business reason or a market area withdrawal. H.R. 8349, 94th Cong., 2d Sess. (1976); S. 2335, 94th Cong., 1st Sess. (1975). The federal act requires that provisions in state laws dealing with termination be the same as those in the federal law. 15 *U.S.C.* § 2806. The federal act, enacted in 1978, does not apply to the instant case but would of course apply in the future to franchises involving the "sale, consignment, or distribution of motor fuel." 15 *U.S.C.* § 2801(1). To the extent that our interpretation of the Franchise Practices Act conflicts with the federal act, we are governed by the federal law.

New Jersey would do the same in this bill which, through the courts, would rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and nondiscriminatory standards. The bill would protect the substantial investment—tangible and intangible—of both parties in the various franchises. It would rule out economic coercion as a business tactic in this most sensitive field.

The New Jersey Legislature has been asked many times in the past to deal on a piecemeal basis with various problems growing out of the franchise relationship. This bill would provide a comprehensive statutory formula for resolving a wide range of questions growing out of the franchise relationship. [Statement accompanying Assembly Bill 2063 (1971)]

The Act, *N.J.S.A.* 56:10–1 *et seq.*, regulates both the ongoing franchise relationship and its termination. A franchise is defined as a written arrangement for a period during which a person grants to another "a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise." *N.J.S.A.* 56:10–3(a). The major substantive provisions of the Act are *N.J.S.A.* 56:10–5, dealing with termination, and *N.J.S.A.* 56:10–7, listing certain practices in which a franchisor may not engage.

The central issue in this case concerns the right of a franchisor to refuse to renew a franchise, *N.J.S.A.* 56:10–5 (section 5), and the consequences of termination when that right does not exist, *N.J.S.A.* 56:10–10 (section 10). Section 5 generally requires that the franchisor give the franchisee at least 60 days advance written notice of termination, cancellation or intent not to renew. The section concludes with these sentences:

It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

When first enacted by the Legislature these two sentences read:

It shall be a complete defense under this act for the franchisor to prove that the stated reasons were for good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with these requirements imposed upon

him by the franchise which requirements must be essential, reasonable and nondiscriminatory.

Governor Cahill conditionally vetoed the bill. His comments on this section were:

> The language in the bill dealing with termination, cancellation and non-renewal (Section 5) is unclear and subject to more than one interpretation. It would appear that a franchise could be terminated, cancelled or not renewed without qualification provided the appropriate notice was given. On the other hand, the same section provides a complete defense to the franchisor if he can prove that the stated reasons for his actions were for good cause, which is limited to a failure by the franchisee to substantially comply with reasonable and non-discriminatory provisions of the franchise. This latter provision is a strong indication that termination, cancellation and non-renewal require good cause. *It is my recommendation that this language be clarified to positively state that it shall be a violation of the act for a franchisor to terminate, cancel or fail to renew a franchise without good cause.* [Governor's Proposed Amendments to *Assembly Bill* 2063 (Dec. 2, 1971); emphasis added]

The Legislature amended the bill to conform with the Governor's suggestions. One striking fact which emerges is the intent that a franchisor could not sever the relationship with its franchisee without good cause. Moreover, the section then defines good cause in terms of the franchisee's failure to substantially comply with the requirements placed upon him in the franchise agreement. The plain meaning of the language, supported by the legislative history, sharply curtails a franchisor's right to end the franchise in the absence of a breach by the franchisee. Thus when the franchisee has complied with the terms of the agreement the franchisor does not possess an unrestricted authority to close out the arrangement in accordance with its terms.

The legal effect of the restriction in section 5 may not be considered in a vacuum. Rather, it must be related to the nature and extent of the remedy provided in section 10. Section 10 entitles a franchisee "to recover damages sustained by reason of any violation of this act and, where appropriate, . . . to injunctive relief." Thus, despite the terms of the agreement, the franchisor may not refuse, at least under some circumstances, to continue the franchise unless it reimburses the franchisee for its loss. Limiting our consideration to the situation in which

the franchisor acts in good faith for a bona fide reason, the damages should be measured, as the trial court stated, in terms of the actual or reasonable value of the franchisee's business when the franchisor cuts off the franchise. See 158 *N.J.Super.* at 481. Restoration of the loss accords with the legislative desire to protect the innocent franchisee when the termination occurs at the franchisor's convenience.

Reasonable value would be that price upon which willing parties, buyer and seller, would agree for the sale of the franchisee's business as a going concern. Several techniques of evaluation may be used. See generally · *G. Ovens & D. Beach, Business and Securities Valuation* (1972); *C. Scharf, Techniques for Buying, Selling and Merging Businesses* 43–58 (1964). Business brokers having knowledge of sales of comparable businesses and of the criteria used in fixing prices may serve as expert witnesses. Methods used by the Internal Revenue Service for tax purposes may serve as useful guidelines. See, *e. g., I.R.C.* § 2031; *Treas.Reg.* §§ 20.2031–1(b), –3; *Rev.Rul.* 59–60, 1959–1 C.B. 237. Other financial analyses may prove helpful. See, *e. g.*, Payne, "A Survey of New Jersey Eminent Domain Law," 30 *Rutgers L.Rev.* 1111, 1132–1160 (1977) (examining valuation techniques for eminent domain). There should, of course, be deducted from the reasonable value the net liquidating worth of assets retained by the franchisee, since otherwise the franchisee would be compensated for more than its loss.

■ Section 10 also provides that a franchisee "where appropriate, shall be entitled to injunctive relief." The defendant contends that the use of injunctive relief compelling the indefinite extension of a franchise arrangement into the future is constitutionally impermissible. The contention rests on a false assumption. Where a franchisor, acting in good faith for a bona fide reason, terminates a franchise in accordance with the terms of the agreement, permanent injunctive relief would not be appropriate, even though damages under the statute would be available. Temporary injunctive relief or restraints to maintain

the status quo during litigation, to provide a franchisee with some additional time to move or close the business, or for some other equitable purpose may be in order. This interpretation of section 10 accords with its structure. Injunctive relief may be afforded only "where appropriate." No comparable limitation is affixed to the right to damages. Thus the Legislature has placed primary emphasis on the right to damages, leaving courts free to exercise their discretion to grant injunctive relief to meet the equities of the particular case. Where, as here, a franchisor's decision to terminate a franchise is based on bona fide business reasons, an injunction would not be available except for temporary relief.

Defendant contends that the legislative history is silent on whether a franchisor may for bona fide economic reasons in good faith end a franchise and that therefore the Act does not apply to that situation. Though the legislative history is silent, the statute is not. It carefully delineates the circumstances in which a franchisor may conclude an agreement without compensation and likewise plainly spells out the situations under which compensation is due. Defendant fails to read sections 5 and 10 of the Act together. The effect of the Act has been to add another provision in the franchise agreements concerning refusals to extend the terms and compensation to be paid to the franchisee in the event of those refusals. The closing of a franchise is conditioned on the payment of compensation.

Interpretation of section 10 to authorize a permanent injunction against termination, cancellation or nonrenewal and to prevent the franchisor from selling its property for bona fide reasons, contrary to the provisions of the parties' agreements, would raise constitutional questions of due process and taking of property for public use without just compensation. The United States Court of Appeals for the Third Circuit intimated as much in *Consumers Oil Corp. v. Phillips Petroleum Co.*, 488 *F.*2d 816 (3 Cir. 1973). The court was asked to restrain Phillips, which had decided to withdraw entirely from its northeast marketing area, from terminating the franchise under which the plaintiff jobber

purchased gasoline. The court stated that an interpretation of section 10 prohibiting Phillips from discontinuing its New Jersey operations would raise substantial constitutional questions. Thus it abstained from reaching the merits of the case in order to permit interpretation by the state courts. *Id.* at 819. A suit subsequently brought in Superior Court never came to trial, and the United States District Court, ultimately deciding the case, held that the Act did not prevent termination of plaintiff's franchise as part of a market withdrawal. The district court believed that prohibition in those circumstances would have been unconstitutional as violative of due process. *Consumers Oil Corp. v. Phillips Petroleum Co.*, No. 456–73 (D.N.J. October 2, 1975).

■ Protection of property, afforded by the federal and state constitutions, encompasses its possession, use and disposition. See *Shelley v. Kraemer*, 334 *U.S.* 1, 10, 68 *S.Ct.* 836, 841, 92 *L.Ed.* 1161, 1179 (1948) (federal constitutional protection); *Jones v. Haridor Realty Corp.*, 37 *N.J.* 384, 391 (1962) (state constitutional protection); *Hutton Park Gardens v. West Orange Town Council*, 68 *N.J.* 543 (1975) (rent control ordinances unconstitutional unless they permit landlords to realize a just and reasonable return). This right is subject to a reasonable exercise of the government's police power. When unreasonable, the statute is invalid. *Nebbia v. New York*, 291 *U.S.* 502, 54 *S.Ct.* 505, 78 *L.Ed.* 940 (1934); *Village of Euclid v. Ambler Realty Co.*, 272 *U.S.* 365, 47 *S.Ct.* 114, 71 *L.Ed.* 303 (1926). Intertwined with this due process concept is the constitutional principle that property may not be taken for a public use without just compensation. See, *e. g., Penn. Central Transp. Co. v. City of New York*, 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.2d* 631 (1978); *Pennsylvania Coal Co. v. Mahon*, 260 *U.S.* 393, 43 *S.Ct.* 158, 67 *L.Ed.* 322 (1922). The trial court pointed out, and we agree, that an added reason favoring construction of the statute as given herein is the precept of so construing a "statute as to render it constitutional if it is reasonably susceptible to such interpreta-

tion." 158 *N.J.Super.* at 480, quoting *State v. Profaci,* 56 *N.J.* 346, 350 (1970).

█ Cities Service also argues that the statutory requirement that a franchisor compensate a franchisee for the value of the franchise when a termination accords with the agreement and is made for good reason violates constitutional due process principles. We find no merit in this contention. The economic effect of compensating the franchisee for the reasonable value of its business when balanced against the evil that the Legislature sought to eliminate is a reasonable accommodation of the rights of the franchisor and the general public in franchise arrangements.[4]

In summary, we hold that a franchisor who in good faith and for a bona fide reason terminates, cancels or fails to renew a franchise for any reason other than the franchisee's substantial breach of its obligations has violated *N.J.S.A.* 56:10–5 and is liable to the franchisee for the loss occasioned thereby, namely, the reasonable value of the business less the amount realizable on liquidation. These are the damages contemplated by *N.J. S.A.* 56:10–10, permanent injunctive relief not being appropriate.

### III

█ Cities Service also challenges the constitutionality of the Act's provision regarding attorneys' fees. *N.J.S.A.* 56:10–10 provides that if the franchisee is successful in the litigation it "shall also be entitled to the costs of the action, including but not limited to reasonable attorney's fees." The defendant is not contending that equal protection requires that it be awarded counsel fees when it prevails in a suit brought by the franchisee.

---

[4]If the franchisor is forced to permit the franchisee to continue to operate and the franchisor suffers an economic loss or cannot earn a fair return on its property, constitutional problems may arise. Arguably the franchisor should at least be permitted sufficient rental so that it receives a fair return on its property.

Rather it argues that the provision is constitutionally defective because it awards attorneys' fees only to successful franchisees who have brought an action under the Act and not to successful franchisors who have sought affirmative relief under the Act.

Defendant assumes that a franchisor has a right to institute an action under the Act, although there is no provision comparable to the one which empowers franchisees to sue. Beginning with that assumption, it argues the statute had to mandate the award of attorneys' fees to a franchisor who successfully sues to enforce its rights under the Act. Defendant relies for this proposition principally upon *Atchison, Topeka & Santa Fe R. Co. v. Vosburg*, 238 *U.S.* 56, 35 *S.Ct.* 675, 59 *L.Ed.* 1199 (1915). That case involved a statute awarding attorneys' fees to shippers recovering damages from railroads for failure to furnish freight cars. However, no provision was made for attorneys' fees for successful actions brought by railroads against shippers for failing to load freight cars within a specified statutory period. The Supreme Court, observing that the statutory rights created on behalf of shippers and the railroads were similar in nature and finding no justification for a difference in treatment, struck down the attorney fee provision as violative of the equal protection clause of the Fourteenth Amendment.

However, the parties protected by the Franchise Practices Act occupy far different positions from the shippers and railroads in *Vosburg*. As indicated previously, the heart of the Act imposes restrictions on franchisors relating to terminating franchises, *N.J.S.A.* 56:10–5, and prohibits franchisors from certain practices, *N.J.S.A.* 56:10–7. The inequities which the Legislature was attempting to correct resulted from the unequal bargaining power of the parties leading to unconscionable termination provisions that imperiled innocent franchisees with substantial losses of their investments. Defendant claims that it was given certain rights under the Act relating to a franchisee's transfer of a franchise. *N.J.S.A.* 56:10–6. Its view of these rights is

misplaced.[5]   Contractually, a franchisor could have prohibited any assignment of the franchisee's equity. *Hanigan v. Wheeler,* 19 *Ariz.App.* 49, 51–52, 504 *P.2d* 972, 974–975 (Ct.App.1972); *Tantum v. Keller,* 95 *N.J.Eq.* 466, 471 (Ch.1924), aff'd *p.c.o.b.,* 96 *N.J.Eq.* 672 (E. & A.1924); *Green v. Camlin,* 229 *S.C.* 129, 132, 92 *S.E.2d* 125, 127 (Sup.Ct.1956).   The Act limits that power. *N.J. S.A.* 56:10–7.   However, the limitation is accompanied by notice and information requirements to be given to the franchisor. *N.J.S.A.* 56:10–6.   These requirements are not independent protective provisions that have been granted to franchisors, but rather limitations on the additional powers now given to franchisees.   These provisions appear to be defensive in nature, perhaps accounting for the difference in the legislative treatment.   A franchisee may institute an action under section 10, but there is no comparable provision for franchisors.   These obligations imposed upon the franchisee are of a substantially different quality and nature from those imposed on franchisors concerning severance of the franchise relationship.   A transfer contemplates continuation of the franchise with the consent of the franchisee, whereas under section 5, the franchise cannot cease to exist without the franchisee's consent.

The Appellate Division stated:

> The legislative concern which led to the enactment of *N.J.S.A.* 56:10–10 authorizing counsel fees to a successful franchisee-plaintiff was based upon the disparity in bargaining power of the parties to most franchise agreements. Where such disparity exists the right to award counsel fees against the more powerful party is justifiable in an effort to maintain a reasonable balance between them. [172 *N.J.Super.* at 203]

We agree with this proposition.   Moreover, the attorneys' fees provision encourages private enforcement of the Act by fran-

---

[5]Defendant also contends that the statute has granted franchisors rights in *N.J.S.A.* 56:10–5.   That provision, as previously discussed, refers to limitations upon the franchisor's cessation of the franchise.   There are some exceptions to these limitations, notably a franchisee's abandonment of the franchise and a franchisee's conviction of an indictable offense directly related to the business.   These exceptions do not create new rights in favor of a franchisor, but reduce the extent of the restraints imposed.

chisees who might otherwise be deterred from instituting meritorious suits and furthers the legislative intent to make franchisees economically whole. In conclusion, then, we are satisfied that a rational basis exists for providing for attorneys' fees in an action successfully brought by franchisees while not providing similar relief for franchisors.

## IV

■ The final issue for consideration concerns one aspect of the fee to be awarded plaintiff Westfield Centre. The statute provides that "[s]uch franchisee, *if successful,* shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees." *N.J.S.A.* 56:10–10 (emphasis added). The issue raised before us is whether the services of plaintiffs' attorneys with respect to the first lawsuit should be included in calculating the fees to be awarded. The first lawsuit had been removed on the defendant's motion to the federal district court. The district court, believing abstention was appropriate and finding the complaint relied upon a superceded lease, dismissed the action rather than remanding it. Since the complaint would have been readily amendable in the state court action, we do not believe defendant's transferral motion should affect plaintiff's right to counsel fees for its efforts in obtaining the restraint. We therefore agree with the trial court that plaintiff is entitled to compensation in that respect. See 162 *N.J.Super.* at 127–128.

The judgment is affirmed and the matter remanded to the trial court for further proceedings to fix the amount of attorneys' fees. We do not retain jurisdiction.

*For affirmance and remandment*—Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For reversal*—None.