208 N.J. Super. 666 (1986)
506 A.2d 817
WINER MOTORS, INC. PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
JAGUAR ROVER TRIUMPH, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 19, 1986.
Decided March 19, 1986.
*668 Before Judges DREIER, BILDER and GRUCCIO.
Douglas C. Fairhurst, pro hac vice, of the State of New York Bar, argued the cause for appellant (Stoldt, Horan & Cino, attorneys; Douglas C. Fairhurst, of counsel; John D. Horan and Carl J. Chiappa, on the brief).
Gary E. Stern argued the cause for respondent cross-appellant (Bloom & Stern, attorneys; Gary E. Stern on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
The parties have cross-appealed from a judgment of the Chancery Division dated March 18, 1985, determining that defendant, Jaguar, Rover, Triumph, Inc. (Jaguar) breached its franchise agreement with plaintiff Winer Motors, Inc. (Winer). The trial judge denied injunctive relief but awarded plaintiff $175,000 compensatory damages for the reasons set forth in his comprehensive letter opinion dated February 15, 1985.
We will only briefly review the facts since they are adequately stated in the opinion below, and our difficulty with the *669 conclusions reached by the trial judge relate more to the application of the prevailing law to the facts he found.
In 1980 Winer was primarily a Chevrolet dealership, although it also marketed M.G.'s, Triumphs, and Jaguars. That year Winer sold 600 to 650 Chevrolets, 150 to 200 Triumphs and M.G.'s and 15 to 20 Jaguars. In 1981 defendant discontinued its M.G. and Triumph lines. But even without the discontinuance of these two profitable lines, Winer was experiencing financial difficulties. Its principals agreed, contingent upon General Motors approval, to sell the stock in the corporation to its Director of Operations, Matt Corvo. Corvo was then a fourteen-year employee and the dealership's general manager. Corvo and two partners, Gary Johnson and Carmine Lemme, determined to buy out the Winer brothers who owned all of the stock in the dealership. The dealership was sufficiently in debt that the purchase price was $10 plus the assumption of the corporate indebtedness. The purchasers' expected capital infusion was approximately $600,000. Of the three, the financial backing was to come mostly from Carmine Lemme, a sophisticated investor with reputed assets of approximately $10,000,000.
The existing franchise agreement, which was to expire December 31, 1981, contained two provisions controlling this transaction, both quoted in the trial court's opinion. Section 33 required the consent of Jaguar to a transfer of more than 10% of the corporate stock, Jaguar reserving the right to terminate the agreement if a transfer were made without its consent. Jaguar, however, committed itself "not to withhold its consent if it is reasonably assured that the Dealer's business will not be adversely affected or its financial condition impaired." The paragraph also referred to 30 days' written notice of cancellation which was required if the transfer were made without Jaguar's consent, or if the consent were conditional, without the conditions having been satisfied. Section 34 similarly provided for a cancellation of the agreement upon a change in the "operating head" of the dealership, named in the agreement as *670 Harold Winer. If the operating head were to leave, Jaguar was "entitled to full particulars and may condition its acceptance of the successor on a satisfactory trial period."
From October 1981 when Jaguar was first informed of the potential sale, through the date of the transfer of the stock in the dealership, March 25, 1982 (immediately following the Chevrolet Division of General Motors' consent to the stock transfer), there was frequent interaction between the parties. This contact was described by the trial judge as "a continued failure [on the part of Winer] to fulfill promises made to Jaguar or to carry out the instructions of Jaguar," and a "continued failure [on the part of Jaguar] to articulate to Winer the standards it was employing in evaluating the franchise transfer application or to articulate what it deemed to be the current relationship between Jaguar and Winer."
On appeal, Jaguar asserts that in fact it did articulate the standards,[1] and Winer contends that notwithstanding certain defaults, it substantially complied with the various ad hoc requirements placed upon it by Jaguar.[2] Although Jaguar *671 ostensibly terminated its agreement 30 days after the March closing, i.e., in late April 1982, it continued to deal with Winer as if Winer were a franchisee through the spring, summer and fall of 1982, until October 25, 1982, when as stated by the trial judge, "Winer was informed by Jaguar that its application to continue as a Jaguar dealer had been denied." We accept the October date found by the trial judge as the final termination of the franchise arrangement. The trial judge also gave due weight to a letter of Gary Johnson sent to Jackling on August 13, 1982 wherein Johnson acknowledged the many deficiencies of his partners and also noted the problems engendered by Jaguar. On balance, however, the trial judge determined that the agreement had been breached by Jaguar, rather than Winer.
The first difficulty we find in the trial judge's approach relates to his choice of law. The parties in the contract stipulated that New Jersey law would "govern questions as to interpretation" of the contract. As noted in Turner v. Aldens, Inc., 179 N.J. Super. 596, 601 (App.Div. 1981):
It is well settled that the law of the state chosen by the parties will be honored so long as that choice does not contravene a fundamental policy of New Jersey.
The trial judge applied New Jersey law generally but held that the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 et seq. did not govern this transaction since plaintiff's business was in Connecticut. We agree but reach different conclusions.
Few franchises are intrastate and most franchise acts govern franchises only located within the enacting state. If the principle applied by the trial judge were correct, any large franchisor *672 by insertion of a choice of law provision requiring the application of the franchisor's home state's law, could with a stroke of a pen remove the beneficial effect of the franchisee's state's remedial legislation. The same argument could be made here as was made with regard to the application of the Retail Installment Sales Act in Turner v. Aldens, Inc., supra, at 601, where we said:
We are of the opinion that our Legislature intended to offer New Jersey consumers the protection of RISA no matter from where the seller deals, and that this intent constitutes a statutory directive respecting choice of law. We believe that a contrary conclusion would contravene fundamental policy of this State as it appears documented in RISA. Thus we hold that that statute must be applied here despite the `election' of the parties in this contract of adhesion ... to look to Illinois law.[3]
Similarly, New Jersey would apply its local law to govern the relationship between an out-of-state franchisor and a New Jersey franchisee. Cf. Simmons v. General Motors Corp., 180 N.J. Super. 522, 539 (App.Div.), certif. den. 88 N.J. 498 (1981). We thus also assume that Connecticut would likewise apply its law to govern the relations between this New Jersey franchisor and the Connecticut franchisee.
As a general proposition the choice of law provision in a contract will be deemed to refer to local law as opposed to the forum's conflict of law rules, which in turn might look to the law of another jurisdiction. Restatement, Conflict of Laws 2d, § 187(3) at 561 (1971). There is an exception, however, based upon public policy. We will reject even the parties' choice of New Jersey local law in order to preserve the fundamental public policy of the franchisee's home state where its statutes afford greater protection. Restatement, Conflict of Laws 2d, § 187(2)(b) at 561 (1971). The modern conflict of laws approach in contract actions applies the "most significant relationship *673 standard." Restatement, Conflict of Laws 2d, § 188 at 575 (1971); State Farm Mutual v. Simmons' Estate, 84 N.J. 28, 34 (1980). In State Farm the court determined that a choice of law "assessment should encompass an evaluation of important state contacts as well as consideration of the state policies affected by, and governmental interest in, the outcome of the controversy." (Id. at 37). Although the parties by contract have chosen New Jersey local law, we will mold the contract provision and apply not only our local law but also our conflict of laws principles, thus looking to the law of Connecticut, the state with the overriding interest in the fair treatment of its franchisees. See Restatement, Conflict of Laws 2d, § 8, comment c, at 22 (1971).
There is, however, little difference between the law of New Jersey and Connecticut on this subject. Nevertheless, as we will later note, the application of Connecticut law might permit the imposition of attorneys fees, if warranted. In addition, in the areas where the law of Connecticut had not been specifically pleaded, the trial judge, under Evid.R. 9(3), properly applied the law of New Jersey as indicative of Connecticut law, although he could have taken notice under Evid.R. 9(2) of the statutory and decisional law of Connecticut.[4] New Jersey's substantive law, even without the application of the Connecticut Franchise Practices Act or its Motor Vehicle Franchise supplement, protects a franchisee from arbitrary nonrenewal or termination. Shell Oil Co. v. Marinello, 63 N.J. 402 (1973), cert. den. 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974). This principle was recognized by the trial judge.
In its letter of October 25, 1982, Jaguar, citing alleged cause, gave two basic reasons why it was entitled to terminate *674 the parties' relationship: first, it did "not need or require a Jaguar dealer in Stratford," and, second, there had been a transfer of ownership in Winer's stock without Jaguar's approval. If the first reason had been Jaguar's sole basis for termination, there would be no question of plaintiff's right to recovery. But the presence of the first reason does not automatically vitiate a bona fide termination for the second reason. The fact that Jaguar may have been hoping that cause would be shown by plaintiff so that the dealership could have been terminated did not remove its power to terminate the dealership if sufficient cause was presented.
Our view of Jaguar's commitment in section 33 of the agreement "not to withhold its consent if it is reasonably assured that the Dealer's business will not be adversely affected or its financial condition impaired," leads us to conclude that its approval of the stock transfer could not have been justifiably withheld. Jaguar's later specification of problems related neither to these contract standards nor to the additional considerations recognized in Simmons v. General Motors Corp., supra, 180 N.J. Super. at 540-41. Here plaintiff maintained an adequate facility for the servicing and repair of vehicles. The individual transferees had not been alleged to be such as would "damage the public image as well as the pocketbook of a manufacturer." Therefore, although Jaguar in its termination letter claimed that approval for the transfer of stock had never been given and that consequently Winer was no longer a franchisee, we can sustain the trial judge's determination that there had been no proper termination due to the unapproved transfer of stock.
The central question on the issue of liability, however, is whether there was a proper basis to terminate the agreement for failure of the agency to comply with ongoing franchise requirements, namely, those of financing and capitalization. We assume that the trial judge found in plaintiff's favor concerning these issues, but, since his opinion is ambiguous dealing as it does with conditional consent of the transfer of the *675 Winer stock rather than the termination of the franchise, we request that he reconsider these points based upon the evidence already taken.[5]
If the Connecticut Act were to be applied, § 42-133v(a) and (b) provide:
(a) Notwithstanding the terms, provisions or conditions of any franchise agreement and notwithstanding the terms or provisions of any waiver, no manufacturer or distributor shall cancel, terminate or fail to renew any franchise with a licensed dealer unless the manufacturer or distributor has satisfied the notice requirement of subsection (d) of this section, has good cause for cancellation, termination or nonrenewal and has acted in good faith.
(b) Notwithstanding the terms, provisions or conditions of any franchise or the terms or provisions of any waiver, good cause exists for the purposes of a termination, cancellation or nonrenewal if:

*676 (1) There is a failure by the dealer to comply with a provision of the franchise which is both reasonable and of material significance to the franchise relationship, provided that the dealer has been notified in writing of the failure within one hundred eighty days after the manufacturer or distributor first acquired knowledge of such failure;
(2) If the failure by the dealer, defined in subdivision (1) of this subsection, relates to the performance of the dealer in sales or service, then good cause shall be defined as the failure of the dealer to comply with reasonable performance criteria established by the manufacturer or distributor if the dealer was apprised by the manufacturer or distributor in writing of such failure; and: (A) the notification stated that notice was provided of failure of performance under this section; (B) the dealer was afforded a reasonable opportunity, for a period of not less than six months, to comply with such criteria; and (C) the dealer did not demonstrate substantial progress towards compliance with the manufacturer's or distributor's performance criteria during such period.
The provisions of subsection (a) require good cause, as defined in subsection (b); specified notice of the cancellation, termination or nonrenewal; and that the franchisor proceed in good faith. Cf. N.J.S.A. 56:10-5, applying to the termination of franchises in general. And see Onderdonk v. Presbyterian Homes of New Jersey, 85 N.J. 171 (1981), incorporating the New Jersey implied requirement of good faith.
If the trial judge, after reconsideration, determines that Jaguar improperly terminated the franchise, the issue of damages must also be reconsidered. By this discussion we do not mean to imply that the $175,000 found by the trial judge was either excessive or insufficient. We cannot, however, determine from his opinion the basis upon which he computed these damages. We do find, however, that without a factual predicate, the limitation to 18 months' losses was improper. If the dealership is found to have been viable and the applicable law requires indefinite renewal of the franchise, the court should determine proper recompense for an indefinite stream of income, discounted to date. Since the determination should be made as of October 1982, the award should have two components, the losses provable to that date, and the future damages based upon the reasonably anticipated net future profits of the dealership. If the physical facilities could reasonably be put to other productive use, the prospective award would be solely for *677 the loss of the franchise, i.e., the per car profit, times the projected sales, discounted to date  unless some other established value of the franchise is demonstrated to the court. The future income should be discounted at a rate appropriate to the risks in the particular industry, having a view to other investments of equal character at the time.[6]
Determining the number of cars that plaintiff would have sold requires a balancing of factors. First, the court should determine plaintiff's historical percentage of sales within geographical areas. If plaintiff, as was testified, sold 75% of the Jaguars actually purchased by the public within Stratford and its immediate vicinity, 50% of the Jaguars purchased in an additional area, and so on, as well as an additional percentage of its total sales to customers from out of its local area, this data can be projected on a map. Next, the court should superimpose on that map the sales generated by the new Darien agency as well as those from other dealerships such as Groton and Hartford. The trial judge should exercise his discretion in determining the effect of these other agencies and assign a reasonable percentage of the total consumer sales that plaintiff would have effected in the various geographical areas in and around Stratford had plaintiff been permitted to continue.
*678 Defendant has correctly asserted that since the Jaguar automobile has become significantly more popular in the last few years, its allocation policy would have limited the cars that plaintiff would have been able to sell. This is true, and would represent the limit of plaintiff's recovery. It is the responsibility of the trial judge to determine from all the proofs before him what the allocation to Winer would have been for the years in question. With such projected sales determined for the years 1982 through 1985 inclusive, a base can be established for any future projection that would be discounted as noted earlier. The figure thus arrived at would be plaintiff's compensatory damages. It may be greater than, equal to, or less than the damages already found by the court, and it well may be that the court has already employed this procedure or a reasonable modification thereof in estimating damages. We cannot, however, so determine from the judge's opinion.
Plaintiff has requested attorney's fees, but this request was denied by the trial judge, applying the preclusion of R. 4:42-9. The trial judge's supplemental letter of February 26, 1985 shows that he expressly declined to apply the Connecticut statute. Our court rule specifically permits counsel fees to be awarded "in all cases where counsel fees are permitted by statute." R. 4:42-9(a)(8). Evid.R. 9(3) requires a trial judge to take judicial notice of the statutory law of another state where a party requests it and gives due notice of such law. The Connecticut statute in section 42-133ee permits civil suits to enjoin violation of the Act and to recover actual damages and costs of suit "including a reasonable attorney's fee." This statute, as noted earlier, was effective June 8, 1982, some four months prior to defendant's breach as determined by the trial judge. The award of such fees is obviously not against the public policy of this State since they may be awarded pursuant to the New Jersey Franchise Practices Act, N.J.S.A. 56:10-10. Westfield Centre Serv. Inc. v. Cities Serv. Oil Co., 172 N.J. Super. 196, 203-04 (App.Div. 1980), aff'd 86 N.J. 453 (1982). The *679 fact that such a fee is authorized does not mean that the court is obliged to award it. Since, however, the trial judge felt he had no power to award a fee, the issue must be remanded for his reconsideration.
This matter is remanded to the Chancery Division for reconsideration of the specific issues of liability, damages and attorney's fees as set forth in this opinion. We request that such reconsideration be accomplished and the parties shall supply such additional information as the trial judge deems necessary, so that he can issue his revised findings of facts and conclusions of law by April 25, 1986. Thereafter, if either party wishes to press its appeal, it shall by May 9, 1986 file a letter brief, and by May 16, 1986 file a response to any such letter brief received by it. This matter shall be set down for reargument before this part on May 28, 1986 unless the parties notify the Clerk of the Appellate Division that they wish to discontinue the appeal. Copies of supplemental appellate briefs shall be sent directly to Judges Dreier, Bilder and Gruccio at their respective chambers, with the originals and one copy of each filed with the Clerk of the Appellate Division. Jurisdiction is retained.
NOTES
[1] Michael Jackling, Jaguar's National Field Operations Manager testified that Jaguar had required completed applications by the principals of the dealership; a letter of intent as to the method by which the dealership would conduct its operations; current financial statements of the dealership; a letter of commitment as to the amount of floor plan financing that would be provided exclusively for the purchase of Jaguar products; and acknowledgement by a bank or financial institution of its acceptance of an automatic cash draft by Jaguar upon shipment to the dealers of allocated vehicles. He further testified that the new owners had failed to establish an adequate floor plan arrangement with a financial institution and that the dealership was seriously under-capitalized. He claimed that as a result the purchasers had lost all credibility with Jaguar.
[2] The purchasers contended that in satisfaction of the various requirements that Jaguar presented to them on a piecemeal basis, they infused an additional $300,000 in working capital into the dealership; they purchased a parts inventory for Jaguar automobiles for an amount in excess of $129,000; they arranged floor plan financing with General Electric Credit Corporation in an amount of $500,000; they remodeled and refurnished a separate Jaguar showroom for approximately $10,000; they upgraded the Jaguar service department and hired a trained "Jaguar service writer;" they maintained a separate manager and salesman in the Jaguar service department; they paid all rent, taxes and utilities on the Jaguar showroom and sent its Jaguar employees to an authorized Jaguar training school as requested by Jaguar; they paid for advertising on billboards, in newspapers and had arranged for radio advertising; and generally they did all of the foregoing specifically upon Jaguar's assurance that once these various demands were met plaintiff would be approved as a franchisee.
[3] We need not determine here whether the dealership agreement constituted a contract of adhesion in order to disregard the choice of New Jersey local law. In this case we recognize "the unequal bargaining power between franchisor and franchisee." Westfield Centre Serv. Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 462 (1981).
[4] In 1982 Connecticut enacted motor vehicle franchise protection legislation, Conn.P.A. 1982-445, eff. June 8, 1982. The termination letter from Jaguar to Winer was dated October 25, 1982. It is thus clear that the Connecticut Act could have been applied. New Jersey enacted less comprehensive motor vehicle franchise protection, N.J.S.A. 56:10-16 et seq., eff. October 21, 1982; but this local legislation is not directly applicable here.
[5] In support of his conclusion of Jaguar's breach and the inappropriateness of injunctive relief the judge stated:

It is apparent from the exacting obligations which Jaguar sought to impose on the Winer transferees that Jaguar sought to rework the Winer franchise by means of this transfer. This was inappropriate. It is also apparent that Jaguar evaluated the Winer transfer in light of its marketing strategy and the newly achieved popularity of its product. In fact, when Jackling was first told of the proposed transfer of the Winer franchise, he responded with a comment that Stratford might not be a viable Jaguar sales point. This consideration was inappropriate.
Despite this Court's finding that the rationale of Jaguar in terminating the franchise of Winer was inadequate and inappropriate, and that, therefore, the termination was a breach of Jaguar's obligation to Winer, this Court will not enjoin Jaguar to accept Winer as a franchisee. While Winer's actions and inactions did not excuse Jaguar's breach, they were hardly commendable. As stated above, had Jaguar clearly articulated appropriate conditions and standards for Winer to Satisfy (sic), this Court might have concluded that Jaguar's termination of Winer was justified. To paraphrase a maxim, the Court will allow to be done that which appropriately might have been done.
Winer consistently failed to honor promises made to Jaguar. The `letter of intent', which Gary Johnson promised would be prepared after a meeting held on May 27, 1982, was never done. Winer never arranged the floor plan financing as promised. Moreover, throughout the evaluation of Winer during the spring and summer of 1982, Gary Johnson revealed himself to be a person with whom Jaguar might reasonably have chosen not to associate. In short, this Court will not burden Jaguar with an unwanted and reasonably undesirable franchise.
[6] For example, if a 12% factor were deemed appropriate and 10 years were deemed a reasonable period of time, the discounting factors for each of the years would be .893, .797, .712, .636,.567, .507, .452, .404, .361, .322 (all rounded). A total discount for such a stream of income would be 565%. Thus 5.65 times the year's projected loss would be the discounted value of the recompense for a similar loss in each of the next ten years. For 15 years, the factor is 6.81, for 20 years the factor is 7.47, and for 30 years is 8.06. The formula is self-limiting at 8.33. L. Schall & C. Haley, Introduction to Financial Management, Appendix B, p. 772 (1977). Beyond some point it could of course be deemed that the loss was becoming speculative. In this case, due to the delay in reaching this stage of the litigation, we know that there would be no speculation as to the loss for the years 1982 through 1985, and, in fact, the interest from the earlier years to date would cancel the discounting factor; but the trial judge should determine how many additional years would be appropriate in valuing plaintiff's loss.